THE HONORABLE MARSHA J. PECHMAN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ROGER and JANET STEGALL, husband and wife, and the marital community composed thereof,

        Plaintiffs,

v.

HARTFORD UNDERWRITERS INSURANCE COMPANY, an insurance company,

        Defendant.

No.: C08-668MJP

DECLARATION OF TONI Y. ANDERS IN OPPOSITION TO PLAINTIFFS' MOTION FOR EVIDENTIARY SANCTIONS

**Noted: May 1, 2009**

I, Toni Y. Anders, declare:

1. I am one of the attorneys representing Hartford Underwriters Insurance Company in this matter. I make this declaration in opposition to Plaintiffs' Motion for Evidentiary Sanctions. I am over the age of 18 and competent to make this declaration based upon my personal knowledge.

2. Attached hereto as **pages 3-5** are true and correct excerpts from the Janet Stegall's deposition transcript.

3. Attached hereto as **pages 6-7** is a true and correct copy of the December 27, 2006 through January 3, 2007, email string between Mrs. Stegall and Mr. Fretwell.

4. Attached hereto as **page 8** is a true and correct copy of the December 28, 2006, estimate for $2,500 prepared by T&W Roofing.

DECLARATION OF TONI Y. ANDERS IN OPPOSITION TO PLAINTIFFS' MOTION FOR EVIDENTIARY SANCTIONS

Page 1

Bullivant|Houser|Bailey PC
1601 Fifth Avenue, Suite 2300
Seattle, Washington 98101-1618
Telephone: 206.292.8930

5. Attached hereto as **page 9** is a true and correct copy of the January 4, 2007, email message from Janinne Armstrong to Mr. Fretwell.

6. Attached hereto as **page 10** is a true and correct copy of my July 15, 2008 letter to Plaintiffs' counsel.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: April 27, 2009 at Seattle, WA.


/s/ Toni Y. Anders
Toni Y. Anders, WSBA #31238

11527351.1

DECLARATION OF TONI Y. ANDERS IN OPPOSITION TO
PLAINTIFFS' MOTION FOR EVIDENTIARY SANCTIONS

Page 2

Bullivant|Houser|Bailey PC
1601 Fifth Avenue, Suite 2300
Seattle, Washington 98101-1618
Telephone: 206.292.8930

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

ROGER and JANET STEGALL,              )
                                      )
                    Plaintiffs,       )
                                      )
            vs.                       ) No. C08-668MJP
                                      )
HARTFORD UNDERWRITERS INSURANCE       )
COMPANY,                              )
                                      )
                    Defendant.        )
                                      )

DEPOSITION UPON ORAL EXAMINATION OF JANET STEGALL

January 20, 2009

Seattle, Washington

REPORTED BY:  Kayla Lynn Rauscher, CCR No. 3078

Kaylareporter@hotmail.com

3

Page 26

1  A. Oh, not very long. 20 minutes might have been stretching
2     it, I think. You have to ask my husband, though, because
3     the time -- you know, right now, time doesn't seem right to
4     me. So... He wasn't there very long. I know he was in a
5     hurry. He had to catch a plane or something. He said he
6     had been really busy with this storm.
7  Q. Other than asking for your -- or exchanging e-mail
8     addresses with you and maybe a business card, do you recall
9     any other conversations that you had with him?
10 A. Just at the time, you know. He was telling me about his
11    knee surgery. He'd injured his knee and had surgery on it
12    or something, and he had -- it seems like he was limping
13    and had a knee brace thing on and --
14 Q. Do you recall him inviting you to contact him, either by
15    phone or e-mail, if you had any questions about anything?
16 A. Yeah. Well, he said that -- he said a few things that I
17    can't remember what they were. He said things like not to
18    worry about -- oh, he said for the trusses, I remember him
19    saying that he would just throw in a few two-by-fours and
20    things to take care of the trusses, I remember him saying
21    that. Oh, what else?
22 Q. Do you remember him inviting you to contact him if he you
23    had any questions?
24 A. I know he was going to contact me. I don't know that he
25    invited me to contact him. And then in the e-mail, I think

Page 27

1     he asked for more pictures. But I think he did, he might
2     have.
3  Q. He might have what?
4  A. I don't know. I know I did call, I did call him later, to
5     ask him about his figures.
6  Q. Did you actually talk to him?
7  A. I actually talked to his company and whatnot. And I -- I
8     said they -- someplace, he must have really messed up,
9     so...
10 Q. And what did they say; I mean, how did that conversation
11    go?
12 A. Well, they said that we -- maybe they'd have him contact me
13    and I don't remember if he did or not after that. But they
14    also said that they thought that the, you know, the prices
15    were okay, but I said, I can't really read -- I had a hard
16    time reading his estimate, a very hard time, and I couldn't
17    find where they paid for the garage at all and -- or for
18    the trusses for that fact, by then. When I got that
19    estimate, it was very, very incomplete, it seemed to me.
20 Q. And is that when you think you called Mr. Fretwell?
21 A. That's when I think I called Mr. -- well, I think I called
22    Hartford first or maybe -- maybe then -- I thought I called
23    Hartford first, but I think I called him first, in fact,
24    first -- I think I called Fretwell's company. I don't
25    remember what their name was. I'd have to look at my

Page 28

1     paperwork to see what their name was.
2  Q. Did you ever send Mr. Fretwell's company copies of any
3     estimates that you had gotten on your own?
4  A. I don't remember that, either. I don't remember. They
5     might have told me to deal with you -- with -- not with
6     you, but with Hartford. It seems like they did tell me
7     later to deal with Hartford.
8  Q. Did you send any estimates to Hartford?
9  A. I think that was one of the big problems, is I never could
10    get a lot of estimates, and when I did get one, yes, we
11    did, but I think it ended up through a legal messenger.
12 Q. No, I mean, before the lawsuit was filed, did you send any
13    estimates to Hartford?
14 A. I -- I did send them some, but they were just on portions,
15    not on totals.
16 Q. Other than temporary repairs, did you send any estimates?
17 A. Yeah.
18 Q. Okay. Which contractor's estimate did you send to
19    Hartford?
20 A. I think T&W, but not regular contractors. We never got a
21    regular contractor to do a full estimate until -- until
22    the -- just before the lawsuit. And I think you --
23    Hartford did not receive it, they might have, but did not
24    receive it, except with the lawsuit.
25 Q. Okay.

Page 29

1  A. And the reason -- there was a reason for that.
2  Q. Okay.
3  A. The reason for that was we couldn't get anybody to finish
4     an estimate.
5  Q. Okay. Going back to what you said, you said you sent
6     Hartford T&W's estimate. Is that the roofing company that
7     did the temporary repairs?
8  A. Only on the -- yeah, right, on the temporary repairs,
9     right.
10 Q. Okay. So that was the only one?
11 A. I think those were only ones, period. There was a couple
12    of them.
13 Q. Okay. A couple of them for temporary repairs?
14 A. Right.
15 Q. Okay.
16 A. There might have been -- there might have been one. I
17    don't know if it was on an upper. Everything was all
18    separate from them. It would be upper roof, flat roof, and
19    house roof. So -- but I think, I know I sent them all the
20    temporary repair ones. Whether they sent me or asked me
21    for another, I think they asked for one after -- it was
22    after the appraiser, so it wasn't before the appraiser, it
23    was after the appraiser, and they wanted another on one of
24    the -- on one of the roofs. But they didn't add it into
25    the appraisal.

Page 30

1  Q. So you sent them another one?
2  A. After, yeah.
3  Q. And how did you send that to them?
4  A. It went through e-mail to that Fretwell.
5  Q. And where was the --
6  A. And a copy, I think a copy must have gone to Hartford the
7     same way.
8  Q. And what company did that estimate come from?
9  A. That would have been that T&W, but it was -- I think it was
10    for the flat roof, which would have been the garage roof.
11 Q. And was that temporary repair?
12 A. No, that was a permanent repair.
13 Q. Okay.
14 A. Like, $2,500 to do that. It was either the upper garage
15    roof or the flat roof, one or the other.
16 Q. Do you still have a copy of that estimate?
17 A. If I didn't give it to them, I should have a copy of it
18    somewhere.
19 Q. Okay.
20 A. I can hunt for it. Right now, I don't even know where the
21    file is, so...
22 Q. According to Michelle Stevens' notes on January 24th, you
23    called to say that you had an opportunity to schedule some
24    roof repairs, and do you recall that conversation?
25 A. The date -- I -- I remember calling her and telling her

Page 31

1     that I had scheduled maybe some roof repairs.
2  Q. Was it T&W that you were talking about, was it the same
3     roofing company?
4  A. It had to be the same roofing company at the time. It
5     might have been with a different representative for the
6     roofing company, but, like I said, they had three owners
7     within three months.
8  Q. And were these roofing repairs going to be permanent
9     repairs or were these also temporary repairs?
10 A. I couldn't tell you. I would have to look and see what
11    happened on those dates. I really can't tell you. We
12    didn't get any permanent repairs done until this year, I
13    can tell you that.
14 Q. Okay. But you think T&W wrote an estimate for permanent
15    repairs back then?
16 A. Yes. It would have been in addition to any temporary
17    repairs that they had already done.
18 Q. And you think that --
19 A. Or that they were doing still.
20 Q. Okay.
21 A. I had a very hard time getting them to make anything
22    permanent. But we also had the wind redamaging during,
23    like, a three-week period of time there, too. So whether
24    -- whether it's the same claim because of the fact that it
25    was still damaging and taking off the temporary repairs or

Page 32

1     whether it would have been a new claim, I don't know. But,
2     either way, it still continued to be temporary repairs
3     until we finally got them done by another company this
4     year.
5  Q. Do you recall anyone from Hartford talking to you about
6     depreciation?
7  A. Oh, I understand depreciation. I think it's -- I didn't
8     think my policy had depreciation in it, since it was a --
9     supposed to have had the full coverage thing in it.
10 Q. Do you remember her talking to you about it, though?
11 A. Oh, I might have, I don't -- don't really remember, because
12    I probably would have cut it off if she started telling me
13    about depreciation.
14 Q. Do you recall that the check that she --
15 A. Had it in it, yeah.
16 Q. -- that Hartford sent to you -- do you recall the check
17    that Hartford sent to you having a deduction for
18    depreciation?
19 A. Yes, I do.
20 Q. And did you call Hartford after you received that check?
21 A. I called because I couldn't figure out what the amount for
22    the roof was on it, the garage roof. There was nothing in
23    it for the garage roof, I didn't think. It had an
24    explanation that came with it.
25 Q. Okay. Did you -- so you had -- you received the check and

Page 33

1     the explanation and you called Hartford?
2  A. And the depreciation and everything else in it, yes, and I
3     called Hartford because there was nothing on there for that
4     garage roof or that final -- the additional -- it seems
5     like that -- 25 or $2,800 sticks in my mind that I sent
6     someone at Hartford, as well as the appraiser, after the
7     appraisal for a portion of that garage roof, the flat roof,
8     or the upper roof, one or the other, but I thought it was
9     the flat roof.
10 Q. And --
11 A. But it could have been the upper roof. I'd have to go dig
12    it out and find out for sure. But that was strictly for
13    the garage and it was in addition to what was not on the --
14    their appraisal, and I know that's the reason I called,
15    because there was nothing in there for that.
16 Q. Did you talk to her about the depreciation deduction?
17 A. I really wasn't so concerned -- yeah, I probably did,
18    because I would not have thought it would be in my policy,
19    the way my policy was supposed to be written.
20 Q. Do you remember what she said to you about how to
21    collect that --
22 A. Yeah, that you have to get it done and then -- then bill
23    her for it afterwards, which I -- you know, to me was the
24    reason why I took out the additional thing, coverage on my
25    policy, so we wouldn't have that. But, in fact, that

9 (Pages 30 to 33)

From: stegallja@comcast.net
Subject: **FW: RE: Dec Storm**
Date: March 13, 2008 1:33:17 PM PDT
To: soniac@mtwlawfirm.com (Sonia chakalo)

-------------- Forwarded Message: --------------
From: stegallja@comcast.net (Janet Stegall)
To: "chuck fretwell" <cashf@msn.com>
Subject: RE: Dec Storm
Date: Wed, 03 Jan 2007 22:07:54 +0000
I'M SORRY THE PICTURES DIDN'T COME THROUGH. BUT I LOST SOME PROGAMS WHEN THE POWER WENT OUT AND MY PRINTER SCANNER SO I HAVE TO GET IT FIXED. I WILL TRY TO GET THEM WITH THESE OTHER ESTIMATES TO YOU IN THE NEXT COUPLE OF DAYS. I WILL HAVE TO BRING THEM OVER FROM ROGERS COMPUTER TO MINE TO SEND THEM.

From: stegallja@comcast.net (Janet Stegall)
Date: January 3, 2007 2:07:54 PM PST
To: "chuck fretwell" <cashf@msn.com>
Subject: **RE: Dec Storm**

From: "chuck fretwell" <cashf@msn.com>
Date: December 28, 2006 6:14:09 PM PST
To: stegallja@comcast.net
Subject: **RE: Dec Storm**

I did not receive any pics with this or estimate.

Thanks,
Chuck

From: stegallja@comcast.net (Janet Stegall)
To: cashf@msn.com
Subject: **Dec Storm** Date: Wed, 27 Dec 2006 17:19:24 +0000

I have been trying to get this to email and had to redo my printer scanner drivers and everything else.
The pictures are after most everything was cleaned up. The one shows the roof structure damage the others mostly show the remaining deck roof that went down.
I wish he would have taken pictures earlier, but this is the only ones he took.
This is the bill from the roofers.

6

Thank You,

Janet Stegall
425-481-3327
22426- 3rd Pl. W.
Bothell, WA. 98021

7

T & W Roofing & Siding Co.  
P.O. Box 564  
Woodinville, WA 98072  
Contractor ID# TWCOM**125LF  
Your Foul Weather Friend since 1975   We Cover It All

12/28/2006  
Ph. (425) 483-2272  
FAX (425) 485-9898  
Email: TandWcomp@aol.com  
www.TandWRoofing.com

## Proposal

**Proposal for:** Janet Stegall  
**Attention:** Same  
**Address:** 22426 3rd Pl. West  
Bothell, WA 98021

**Project Name:** House repair  
**Contact:** Same  
**Job Address:** Same

**Phone:** 425-481-3327

---

**T & W Company proposes to furnish material and labor complete in accordance with specifications and terms listed below.**

Replace wind damaged back side of house with 20 year 3-tab roofing to match. Repair any damaged structural sheeting. Replace damaged gutter back gutter and downspout.

Repair Price: $2,500.00 + tax

Terms: Due upon completion

All work to be completed in a workmanlike manner according to standard practices. Any alteration or deviation from the above specifications involving extra cost will become an extra charge over and above the estimate. All agreements contingent upon strikes, accidents or delays beyond our control. Owner to carry fire, tornado, and other necessary insurance. Our workers are fully covered by Workmen's Compensation Insurance.

Authorized Signature _____  
David Tooley - Owner

Date 12-28-2006

Upon payment in full, owner will receive written labor warranty, manufacture's warranty, if any, and a Lien Waiver.

Acceptance of Proposal - The above prices, specifications, and conditions are hereby accepted. You are authorized to do the work specified. Payment will be made as outlined above.

NOTE: This proposal may be withdrawn if not accepted within 90 days.

Signature

Date of acceptance

8

From: stegallja@comcast.net
Subject: **FW: Stegall's Storm Damage**
Date: March 13, 2008 1:23:51 PM PDT
To: soniac@mtwlawfirm.com (Sonia chakalo)
1 Attachment, 8.6 MB

--------------- Forwarded Message: ---------------
From: "Janinne Armstrong" <janinnea@hotmail.com>
To: cashf@msn.com
Cc: stegallja@comcast.net
Subject: Stegall's Storm Damage
Date: Thu, 4 Jan 2007 03:54:19 +0000

I'm sending this for my mothe Janet Stegall as her e-mail will not send it.
You will receive one more e-mail to follow with the additional photos.

Janinne Armstrong



9

**Bullivant | Houser | Bailey** PC

Attorneys at Law

TONI Y. ANDERS
Direct Dial: (206) 521-6458
E-mail: toni.anders@bullivant.com

July 15, 2008

Timothy A. Bearb
Law Offices of Michael T. Watkins
1100 Dexter Ave. N
Seattle, WA 98109

Michael T. Watkins
Law Offices of Michael T. Watkins
1100 Dexter Ave. N
Seattle, WA 98109

    Re:    Stegall, et ux. v. Hartford Underwriters
             USDC Case No. C08-0212TSZ

Dear Timothy and Michael:

    Enclosed is a copy of the file from RJMW Claim Service. Please call if you have questions.

                                         Sincerely,

                                         Toni Y. Anders

TYA
cc:    Lee S. Siegel

10676722.1